RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0006a.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

AMERICAN BEVERAGE ASSOCIATION,
                                *Plaintiff-Appellant*,

    *v.*                                                            No. 11-2097

RICK SNYDER, BILL SCHUETTE, and ANDREW
DILLON,
                                *Defendants-Appellees*,

MICHIGAN BEER & WINE WHOLESALERS
ASSOCIATION,
                                *Intervenor-Appellee*.

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 1:11-cv-195—Gordon J. Quist, District Judge.

Argued: July 20, 2012

Decided and Filed:  January 7, 2013

Before:  CLAY and SUTTON, Circuit Judges; RICE, District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Patricia A. Millett, AKIN GUMP STRAUSS HAUER & FELD LLP,
Washington, D.C., for Appellant.  John J. Bursch, OFFICE OF THE MICHIGAN
ATTORNEY GENERAL, Lansing, Michigan, Anthony S. Kogut, WILLINGHAM &
COTÉ, East Lansing, Michigan, for Appellees. **ON BRIEF:** Patricia A. Millett, AKIN
GUMP STRAUSS HAUER & FELD LLP, Washington, D.C., Hyland Hunt, AKIN
GUMP STRAUSS HAUER & FELD LLP, Dallas, Texas, for Appellant. John J. Bursch,
Margaret A. Nelson, Ann M. Sherman, OFFICE OF THE MICHIGAN ATTORNEY
GENERAL, Lansing, Michigan, Anthony S. Kogut, Curtis R. Hadley, WILLINGHAM
& COTÉ, East Lansing, Michigan, for Appellees. Cory L. Andrews, WASHINGTON
LEGAL FOUNDATION, Washington, D.C., Helgi C. Walker, WILEY REIN LLP,
Washington, D.C., for Amici Curiae.

_____

[*]The Honorable Walter H. Rice, United States District Judge for the Southern District of Ohio,
sitting by designation.

CLAY, J., delivered the opinion of the court in which SUTTON, J., and RICE, D. J., joined.  SUTTON, J. (pp. 19–26), delivered a separate concurring opinion.  RICE, D. J. (pp. 27–28), also filed a separate concurring opinion.

———————————————

**AMENDED OPINION**

———————————————

CLAY, Circuit Judge.   Plaintiff, the American Beverage Association ("Association"), appeals the district court's order granting summary judgment to Defendants, Governor Rick Snyder, Attorney General Bill Schuette, and Michigan Treasurer Andrew Dillon in their official capacities (collectively Defendants), and the Michigan Beer & Wine Wholesalers Association ("MBWWA"), which intervened in support of Defendants.  Plaintiff argues that Mich. Comp. Laws § 445.572a(10), which requires certain returnable bottles and cans to possess a unique-to-Michigan mark designation, violates the dormant Commerce Clause, regulates extraterritorially, and discriminates against interstate commerce.   For the reasons set forth below, we **AFFIRM in part, REVERSE in part, and REMAND** for further proceedings.

**BACKGROUND**

**A.       Michigan's Beverage Container Deposit Law**

Michigan is one of ten states that requires consumers to pay a can, plastic bottle, or glass bottle deposit when purchasing specified beverage containers.  Mich. Comp. Laws § 445.571 *et seq*.[1]  In 1976, Michigan enacted the Michigan Container Act, commonly referred to as the "Bottle Bill."  The purpose of the Bottle Bill was to promote and encourage the recycling of beverage containers by offering a cash refund of a ten-cent deposit to consumers and distributors in an effort to reduce the amount of bottle and can litter.  *See* Mich. Comp. Laws § 445.571 *et seq.*; *see also* Michigan Bottle Bill, A Final Report to: Michigan Great Lakes Protection Fund,

---

[1]The other states are: Massachusetts, New York, Maine, Vermont, Iowa, Hawaii, California, Oregon, and Connecticut.

http://www.michigan.gov/documents/ deq/deq-ogl-mglpf-stutz_249882_7.pdf, at 2 (last visited August 20, 2012).  The Bottle Bill requires any beverage—defined as "a soft drink, soda water, carbonated natural or mineral water, or other nonalcoholic carbonated drink; beer, ale, or other malt drink of whatever alcoholic content; or a mixed wine drink or a mixed spirit drink"—to be sold to consumers in "returnable" containers.  *See id.* §§ 445.571(a), 445.571(d).  A "returnable" container is a container "upon which a deposit of at least 10 cents has been paid, or is required to be paid upon the removal of the container from the sale or consumption area, and for which a refund of at least 10 cents in cash is payable by every dealer or distributor . . . ."  *See id.* § 445.571(d).  All businesses that sell beverages to consumers are required to accept for rebate an empty container "of any kind, size, and brand" of beverage that the retailer (dealer) sells.  *See id.* § 445.572(2).  In exchange, the business or a reverse vending machine[2] provides the consumer a ten-cent deposit refund paid on that container.  The retailers then return the empty containers to beverage distributors or manufactures and collect the ten-cent refund.  *See id.* § 445.572(6).  The Bottle Bill requires beverage containers sold within the State to clearly indicate the state's name and the containers' refund value.  *See id.* § 445.571(d).  That information appears as "MI 10¢" on each individual beverage container.

### B.       The Redemption Problem

Although the Bottle Bill has been successful in improving the environment by promoting the recycling of beverage containers, the bill also created two unanticipated problems: (1) consumers deposited more money on nonalcoholic beverage containers than distributors or manufacturers paid out in refunds (underredemption); and (2) the value of the deposits collected by the distributor or manufacturer was less than the total value of refunds paid (overredeemption). To address the problem of underredemption, the Michigan Legislature amended the Bottle Bill in 1989, and mandated that the value of unclaimed deposits escheat to the State Treasury.  Under the amendment, the State

---

[2]A "reverse vending machine" is defined as a "device designed to properly identify and process empty beverage containers and provide a means for a deposit refund on returnable containers."  Mich. Comp. Laws § 445.572a(12)(j).

Treasury gave 25 percent of the unclaimed revenue to in-state beverage retailers and the remaining 75 percent financed a Michigan cleanup and redevelopment trust fund. *See id.* § 445.573(c).

Despite the 1989 Bottle Bill Amendment, the redemption problem continued. Specifically, the State recognized that individuals would purchase beverage containers outside of Michigan and then attempt to return the beverage containers in Michigan to redeem the ten-cent deposit. As a result, the unauthorized returns and redemptions reduced the revenue stream to the State because no deposit was paid to the State of Michigan. A 1998 study estimated that fraudulent redemption in Michigan of beverage containers originating from outside of Michigan resulted in a loss of $15.6 to $30 million every year in Michigan deposits. In an effort to reduce these fraudulent redemptions, the Michigan Legislature enacted a statute criminalizing the redemption of containers by any individual who knows or should have known that no deposit was paid on the container. *See id.* §§ 445.574a and b.

### C.      Michigan's Unique-Mark Amendment to the Bottle Bill

In December 2008, the Michigan Legislature amended the State's Bottle Bill in order to increase revenue to the State. The Amendment required that, in addition to the MI 10¢ designation, containers for certain brands of beverages bear a "symbol, mark, or other distinguishing characteristic that is placed on a designated metal container, designated glass container, or desginated plastic container by a manufacturer to allow a reverse vending machine to determine if that container is a returnable container . . . ." *See id.* § 445.572a(10). The mark "must be unique to the state," and can be "used only in this state and 1 or more other states that have laws substantially similar to this act." *Id.* The provision does not define "substantially similar," but the State interprets the phrase to include all states with Bottle Bill deposit schemes, including those where the deposit is less than Michigan's. Failure to comply with the new provision could result in a penalty of up to six months' imprisonment and/or a $2,000 fine. *See id.* § 445.572a(11). The provision appliedis only to companies that meet the State's specified threshold sales requirements.

On March 1, 2010, the Bottle Bill provision went into effect for nonalcoholic beverages in 12-ounce metal containers.[3] *See id.* § 445.752a(2). On February 24, 2011, the provision went into effect for nonalcoholic beverages in 12-ounce glass or plastic containers.[4] *See id.* § 445.572a(3)–(5).

Plaintiff is a "non-profit association of the manufacturers, marketers, distributors, and bottlers of virtually every nonalcoholic beverage sold in the United States," including bottled water, juices, juice drinks, soft drinks, teas, dairy beverages, sports drinks, and energy drinks. (Pl.'s Br. 12.) Plaintiff seeks to protect "its members' legal rights and the interests of the industry and beverage consumers" and represents members that produce beverages regulated by the Michigan 2008 Amendment to the Bottle Bill. (*Id.*)

On February 25, 2011, Plaintiff filed this action in the United States District Court for the Western District of Michigan against Defendants, seeking declaratory, injunctive, and other relief. Plaintiff claimed that Mich. Comp. Laws § 445.572a(10), a provision of the 2008 Bottle Bill, violated the Commerce Clause of the United States Constitution, art. I, § 8, cl. 3. Plaintiff alleged that the 2008 provision requires interstate beverage manufacturers, on pain of criminal penalty, to produce, distribute, and sell designated beverages in unique-to-Michigan containers, and prohibits the sale of those same packaged beverages in all (or almost all) other States in the Country. Plaintiff further claimed that compliance with Michigan's unique-mark requirement is extraterritorial because the Association's members must "change the way they source and deliver product both in Michigan and in the other states in which they operate . . . [by isolating] the Michigan-specific product in separate Michigan- specific manufacturing and distribution locations or in segregated areas of multi-state

---

[3] This currently includes seven Coca-Cola Enterprise products (Coca-Cola, Diet Coke, Caffeine Free Diet Coke, Sprite, Coca-Cola Zero, Cherry Coke, and Dr. Pepper), five Pepsi Bottling Group products (Pepsi, Diet Pepsi, Mountain Dew, Diet Mountain Dew, and Diet Caffeine Free Pepsi), and three Dr. Pepper/Snapple products (A&W, Dr. Pepper, and Vernors). (Def.'s Br. 13.)

[4] The beverages include two Coca-Cola Refreshment products (Coca-Cola, Diet Coke) and four Pepsi Beverage Company products (Pepsi, Diet Pepsi, Mountain Dew, Diet Mountain Dew). (Def.'s Br. 14.)

manufacturing and distribution facilities." (R.1, Compl. ¶ 60.) According to Plaintiff, compliance with the statute increases the need for more warehouse space to separate inventory and eliminates flexibility in the supply chain.

Plaintiff moved for summary judgment arguing that, as a matter of law, the challenged statute is both extraterritorial and discriminatory in violation of the dormant Commerce Clause. Alternatively, Plaintiff argued that it should prevail under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970), which upholds a state regulation unless the burden on interstate commerce outweighs the local benefits. *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986) (citing *Pike*, 397 U.S. at 142). Defendants filed their response in opposition to summary judgment and, alternatively moved for summary judgment in their favor. On April 26, 2011, the district court issued an order, which permitted the MBWWA to intervene in support of Defendants.

The district court granted summary judgment to Defendants, finding that Mich. Comp. Laws § 445.572a(10) is neither discriminatory nor extraterritorial. As to the application of the *Pike* balancing test, the district court concluded that summary judgment was not appropriate because a question of material fact existed on the extent of the burden that Mich. Comp. Laws § 445.572a(10) places on interstate commerce. Plaintiff filed a motion for reconsideration or for certification of interlocutory appeal. The district court denied Plaintiff's motion for reconsideration but granted certification for interlocutory appeal on the issue of whether Mich. Comp. Laws § 445.572a(10) is extraterritorial or discriminatory in violation of the dormant Commerce Clause under 28 U.S.C. § 1292(b). This Court issued an order concluding that an interlocutory appeal was appropriate in this matter.

## DISCUSSION

### I.       Standard of Review

We review *de novo* the district court's grant of summary judgment. *Olde v. Decatur Cnty., Tenn.*, 421 F.3d 386, 389 (6th Cir. 2005). Summary judgment is

appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). We "must view all the facts and the inferences drawn therefrom in the light most favorable to the nonmoving party." *Cummings v. City of Akron*, 418 F.3d 676, 682 (6th Cir. 2005) (internal quotations and citation omitted). After the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and alternation omitted).

## II.     Dormant Commerce Clause

Under the Commerce Clause, Congress has the power "[t]o regulate Commerce with foreign Nations, and among the several States . . . ." U.S. Const., art. I, § 8, cl. 3. "We have interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State." *C & A Carbone, Inc.*, *v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994). However, "[t]he [Commerce] Clause has long been understood to have a 'negative' aspect that denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of commerce." *Or. Waste Sys., Inc. v. Dep't' of Envtl. Quality of State of Or.*, 511 U.S. 93, 98 (1994). "The Clause, by negative implication, restricts the States' ability to regulate interstate commerce." *Huish Detergents, Inc. v. Warren Cnty., Ky.*, 214 F.3d 707, 712 (6th Cir. 2000). "The dormant Commerce Clause is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Dept. of Revenue of Ky. v. Davis*, 553 U.S. 328, 337–38 (2008) (quoting *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273–74 (1988)).

This Circuit has adopted a two-step analysis to evaluate challenges to the dormant Commerce Clause. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628, 644 (6th Cir. 2010). Under the first step, we must determine whether "a state statute directly regulates or discriminates against interstate commerce, or [whether] its effect is to favor

in-state economic interests over out-of-state interests." *Id.* (quoting *Brown-Forman*, 476 U.S. at 579). "A [state regulation] can discriminate against out-of-state interests in three different ways: (a) facially, (b) purposefully, or (c) in practical effect." *Id.* at 648 (quoting *E. Ky. Res. v. Fiscal Court of Magoffin Cnty. Ky.*, 127 F.3d 532, 540 (6th Cir. 1997)). "[T]he critical consideration is the overall effect of the statute on both local and interstate activity." *Brown-Forman*, 476 U.S. at 579. The plaintiff bears the initial burden of proof to show that the state regulation is discriminatory. *Davis*, 553 U.S. at 338.

If the plaintiff satisfies its burden, then "a discriminatory law is virtually *per se* invalid and will survive only if it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *Id*. at 328 (quoting *Or. Waste Sys., Inc.*, 511 U.S. at 101 (internal citation omitted)). However, if the state regulation is neither discriminatory nor extraterritorial, then the court must apply the balancing test established in *Pike*. Under the *Pike* balancing test, a state regulation is upheld "unless the burden it imposes upon interstate commerce is 'clearly excessive in relation to the putative local benefits.'" *Int'l Dairy*, 622 F.3d at 644 (quoting *Pike*, 397 U.S. at 142).

### A.   Mich. Comp. Laws § 445. 572a(10), Michigan's unique-mark provision, does not discriminate against interstate commerce

Plaintiff argues that the Michigan unique-mark mandate, which requires certain beverage containers to possess a particular "symbol, mark, or other distinguishing characteristic," Mich. Comp. Laws § 445.572a(10), discriminates against interstate commerce, facially, purposefully, and in effect, because the provision penalizes manufacturers if they choose to sell the beverage containers both in Michigan and in another state.

### 1.   Facial Discrimination

Plaintiff claims that the unique-packing requirement facially violates the dormant Commerce Clause because the provision only applies to interstate manufacturers or

shippers of beverages. According to Plaintiff, "Michigan enacted operative thresholds that are sufficiently high [and] are only met by companies who have a very high volume of business—that is, national brands." (Pl.'s. Br. at 40.) The district court found that Michigan's unique-mark provision is not facially discriminatory because "by its plain terms, the unique-mark requirement applies to all beverage manufacturers who meet the specified threshold regardless of their in-state or out-of-state origins."

"To determine whether a law violates [the] 'dormant' aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citations omitted). "[D]iscrimination against interstate commerce in favor of local business or investment is *per se* invalid. . . ." *Carbone*, 511 U.S. at 392 (citation omitted). Thus, a state law is *per se* invalid if it provides "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *United Haulers*, 550 U.S. at 338 (internal quotation marks and citation omitted).

Michigan's unique-mark provision is not facially discriminatory against interstate commerce. The provision does not distinguish between in-state and out-of-state beverage manufacturers and requires all beverage containers to follow the unique-mark requirement. The provision states in relevant part:

> A symbol, mark, or other distinguishing characteristic that is placed on a designated metal container, designated glass container, or designated plastic container by a manufacturer to allow a reverse vending machine to determine if that container is a returnable container must be unique to this state, or used only in this state and 1 or more other states that have laws substantially similar to this act.

Mich. Comp. Laws § 445.572a(10). On its face, the provision is neutral in application. There is not an "obvious effort to saddle those outside the State" with the burden of complying with the regulation. *Chem. Waste Mgmt. Inc., v. Hunt*, 504 U.S. 334, 346 (1992). Rather, the same unique marking requirement applies equally to in-state and out-of-state manufacturers. Therefore, whether a beverage manufacturer is located in

Michigan or outside of the state, it must still comply with the statute's requirements.[5] *See United Haulers*, 550 U.S. at 345 (upholding a flow control ordinance which treated "in-state private business interests exactly the same as out-of-state ones, [and therefore did] not discriminate against interstate commerce for purposes of the dormant Commerce Clause") (internal quotation marks omitted).

### 2.        Purposeful Discrimination

Plaintiff also alleges that Michigan's unique-mark provision has a discriminatory purpose on the basis that the provision prohibits the sale of the same beverage containers manufactured in Michigan and other states, and prevents vendors in Michigan from purchasing the same beverage containers manufactured by out-of-state distributors.

To determine whether a state regulation purposefully discriminates within interstate commerce, we turn to the actual language in the statute. This is because the most "persuasive evidence of the purpose of a statute [are] the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. In such cases we have followed their plain meaning." *E. Ky. Res.,* 127 F.3d at 542 (quoting *Perry v. Commerce Loan Co.*, 383 U.S. 392, 400(1966)). Our review not only includes the statute itself, but also the legislative history and legislative intent to determine whether the statute achieved its legislative purpose.

Our analysis is somewhat limited given the scant legislative history of the State's provision. The Michigan Legislature stated that the intended purpose of the statute was to prevent the illegal, fraudulent redemption of beverage containers in the State. *See, e.g.,* House Fiscal Agency, Legislative Analysis of the Bottle Bill Revisions and RVM Antifraud Act,

---

[5]Plaintiff claims that Michigan's unique-mark provision only applies to companies that engage in commerce in Michigan plus one other State as opposed to companies that operate solely within Michigan. But that is a misstatement. Any Michigan-based company that meets the State's threshold sales requirement and chooses to engage in business within Michigan is subject to the same unique-mark provision as companies that compete in the national market and conduct business in Michigan. *See* Mich. Comp. Laws § 445.572a(1), (3), (5).

http://www.legislature.mi.gov/documents/2007-2008/billanalysis/House/pdf/ 2007-HLA-5147-3.pdf, 2–6 (last visited August 20, 2012). The Michigan Soft Drink Association ("MSDA") provided further support for the concern that fraudulent redemption was widespread. The MSDA stated that "[i]n recent years, the fraudulent redemption of out-of-state beverage containers in Michigan has increased. Unclaimed deposits paid to the state declined from the peak of $23.5 million in 2000, to $8.9 million in 2007—a drop of more than $10 million." *See* MSDA Fraudulent Redemption, http://misoftdrink.org/Fraudulent_Redemption.asp (last visited August 20, 2012). Plaintiff asserts that Michigan's goal is to "maximize the flow of revenue" into the State by discriminating against interstate actors. But as the district court recognized, "there is nothing that indicates that Michigan is attempting to benefit local economic actors at the expense of out-of-state actors." The text of the statute confirms that the Michigan Legislature intended to address a significant problem—the fraudulent redemption of beverage containers purchased outside the State—by regulating the conduct of both in-state and out-of-state actors. *See* Mich. Comp. Laws § 445.572a(10). Absent concrete evidence from the statutory language that the unique-mark requirement is purposefully discriminatory, Plaintiff cannot prevail on this claim.

### 3.    Discriminatory Effect

A statute may be discriminatory in effect if "the claimant [can] show both how local economic actors are favored by the legislation, and how out-of-state actors are burdened by the legislation." *Int'l Dairy*, 622 F.3d at 648 (quoting *E. Ky. Res.*, 127 F.3d at 543).

Plaintiff identifies three reasons why Michigan's unique-mark provision is discriminatory in effect: "(1) the law requires the creation and maintenance of special state-exclusive production and distribution operations in order to do business in Michigan; (2) it eliminates the competitive advantages otherwise enjoyed by interstate companies; and (3) it impedes the free movement of commerce by imposing an economic and practical toll on interstate companies only." (Pl.'s Br. 42–43); *see also*

*Granholm v. Heald*, 544 U.S. 460 (2005); *Hunt v. Washington State Apple Adver. Comm'n*, 432 U.S. 333, 351 (1977).

Plaintiff relies on the Supreme Court case of *Granholm v. Heald* to show that the provision has a discriminatory purpose. In *Heald*, Michigan residents and an out-of-state winery alleged that Michigan laws that governed the distribution of alcohol violated the Commerce Clause because the laws allowed in-state wineries to ship directly to consumers in Michigan, subject only to a licensing requirement, while out-of-state wineries, whether licensed or not, were prohibited from direct shipment. *Heald*, 544 U.S. at 469. The Supreme Court held that the Michigan regulatory scheme discriminated against interstate commerce because out-of-state wineries faced "two extra layers of overhead [which] increase[d] the cost of out-of-state wines to Michigan consumers." *Id*. at 474. The Court explained that "[t]he differential treatment require[d] all out-of-state wine, but not all in-state wine, to pass through an in-state wholesaler and retailer before reaching consumers." *Id*. Plaintiff in this case alleges in a similar fashion that the "Michigan-exclusive packaging mandate similarly requires interstate beverage companies to establish a Michigan-only production, warehousing, transportation, and distribution operation" in order to sell to Michigan consumers.

*Heald* is distinguishable, however, on the basis that the Michigan laws in *Heald* purposefully imposed a burden on out-of-state wineries by implementing a complete ban on direct shipment while allowing in-state wineries to enjoy the benefits of direct shipment. This type of regulatory scheme clearly attempted to affect the market playing field by allowing Michigan wineries to gain market share against their out-of-state competitors.

In this case, the Michigan provision does not favor in-state beverage manufacturers and distributors over out-of-state. The unique-mark provision requires all those who sell certain amounts of beverages in Michigan to use the same unique-to-Michigan mark, without any reference to in-state or out-state origins. Contrary to Plaintiff's assertion, the Michigan provision does not create an "extra layer of overhead" because all manufacturers and distributors are subject to the same provision. In essence,

any manufacturer who wants to sell and distribute beverage containers regardless of whether they are in-state or out-of-state, is subject to the unique-mark provision.  Thus, we agree with the district court's assessment that "the unique-mark requirement burdens in-state beverage manufacturers who meet the designated thresholds to the same extent it burdens out-of-state manufacturers who meet the designated thresholds."  We therefore conclude that the State's statute does not discriminate against interstate commerce on this basis.

> **B.        Mich. Comp. Laws § 445.572a(10) is extraterritorial in violation of the dormant Commerce Clause**

Despite our conclusion that Michigan's unique-mark provision does not discriminate against interstate commerce, the Supreme Court recognizes  "a second category of regulation that is also virtually *per se* invalid under the dormant Commerce Clause"—whether the law regulates extraterritorial commerce. *Int'l Dairy*, 622 F.3d at 645.  A statute is extraterritorial if  it "directly controls commerce occurring wholly outside the boundaries of a State [and] exceeds the inherent limits of the enacting State's authority." *Healy v. Beer Inst. Inc.*, 491 U.S. 324, 336 (1989).  The relevant inquiry is whether the "practical effect of the regulation is to control conduct beyond the boundaries of the State." *Id.* at 336 (citing *Brown-Forman*, 476 U.S. at 579).  To determine a statute's "practical effect," the court not only considers the consequences of the statute itself, but also "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation." *Id*.

The Supreme Court has applied the extraterritoriality doctrine only in the limited context of price-affirmation statutes.  These statutes force regulated entities to certify that the in-state price they charge for a good is no higher than the price they charge out-of-state. *See Healy*, 491 U.S. at 337–40; *Brown-Forman*, 476 U.S. at 582–84.  In *Brown-Forman*, New York instituted a law that required distillers who posted wholesale prices in the state to not charge a lower price for the product in any other state during the month of posting.  The New York law prevented the distillers from offering promotional

allowances to wholesalers in other states, because the allowances lowered the effective price below the New York posted price.  *Brown-Forman*, 476 U.S. at 577–78.  The Supreme Court found that by "[f]orcing a merchant to seek regulatory approval in one State before undertaking a transaction in another directly regulates interstate commerce." *Id*. at 582.  Although New York is within its power to regulate the sale of liquor within its state, the Court held that "it may not project its legislation into [other States] by regulating the price to be paid for liquor in those States."  *Id*. at 582–83 (internal quotation marks and citation omitted).

Similarly in *Healy*, the Supreme Court struck down Connecticut's price affirmation statute, which required out-of-state beer distributors to post their prices on each brand of beer sold in the State and to also affirm that their posted prices were no higher than prices in the border states of Massachusetts, Rhode Island, and New York. *Healy*, 491 U.S. at 326–29.  The Court found that Connecticut's statute created "the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude."  *Id*. at 337.  In addition, the Court concluded that the "effect of the Connecticut statute is essentially indistinguishable from the extraterritorial effect found unconstitutional in *Brown-Forman*" by requiring "out-of-state shippers to forgo the implementation of competitive-pricing schemes in out-of-state markets because those pricing decisions are imported by statute into the Connecticut market regardless of local competitive conditions."  *Id*. at 339.  Therefore, the Court concluded that any statute that has "the undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State" is extraterritorial and violates the dormant Commerce Clause. *Id*. at 337.

The district court noted that the Sixth Circuit has applied the extraterritorial doctrine to product labeling restrictions.  Specifically, we held in *International Dairy* that Ohio's labeling rule, which restricted the "types of claims that dairy processors could make about milk and milk products" did not violate the dormant Commerce Clause. *Int'l Dairy*, 622 F.3d at 633–34.  The plaintiffs argued that Ohio's labeling rule "force[d] them to create a nationwide label in accordance with Ohio's requirements" in

order to satisfy the complex national distribution channels for milk products.  *Id*. at 647.
The Sixth Circuit disagreed and stated that:

> [U]nlike the price-affirmation statutes, which directly tied their pricing
> requirements to the prices charged by the distillers in other states, the
> Ohio Rule's labeling requirements have no direct effect on the Processors'
> out-of-state labeling conduct.  That is to say, how the Processors label
> their products in Ohio has no bearing on how they are required to label
> their products in other states (or vice versa).  Nor does compliance with
> the Ohio Rule raise the possibility that the Processors would be in
> violation of the regulations of another state—the key problem with the
> New York statute in *Brown-Forman*.  The Rule accordingly does not
> purport to regulate conduct occurring wholly outside the state.

*Id*. (quotation marks and citation omitted).  Thus, the Sixth Circuit concluded that Ohio's
product labels could be used anywhere in the country and did not create an
extraterritorial problem.

But Plaintiff asserts that this case does not fit squarely either within the price-
affirmation extraterritorial cases addressed by the Supreme Court or the product labeling
case from this Circuit.  Rather, Plaintiff claims that Michigan's unique-mark requirement
is "quite different" because the  label or container used in Michigan can be used only in
Michigan.  It cannot be used anywhere else.  According to Plaintiff, Michigan "has made
itself an economic island withdrawn from the national commerce stream in beverages."
Plaintiff cautions that if Michigan can "*both* prescribe what [beverage] products can be
sold in-state *and* outlaw the sale of that same [beverage] product in other States of the
Union . . . [then] it can do it for every other product [and] [s]o can every other State."
Plaintiff asserts that the State even criminalizes sales occurring in other states in
violation of its statute by imposing a penalty of either a $2,000 fine and/or up to six
months imprisonment.

Defendants dismiss Plaintiff's argument by stating that Michigan's unique-mark
requirement does not govern extraterritorially because no conflict exists between the
states since Michigan is the only state with a unique-mark requirement, and the statute's
requirements does not directly control conduct occurring wholly outside the State's
border. We find Defendants' logic flawed for several reasons.

First, Defendants fail to explore other alternative measures that could combat the State's redemption problem. Defendants argue that the State's provision is the only means to prevent fraudulent redemption and allow the State to retrieve unclaimed deposits to increase the state's revenue. But it is difficult to reconcile how this provision is the only means for the State to address its redemption problem, when no other efforts were made by Defendants that could potentially satisfy the state's purported legitimate purpose in a non-extraterritorial fashion. For example, it was suggested during oral argument that the State of Michigan could use the money from the unclaimed deposits and impose less burdensome measures, which may include limiting the number of beverage containers that may be redeemed by an individual or company. The State could also require consumers who wish to recycle beverage containers in Michigan to provide a proof of purchase receipt, which would indicate that the container was sold and purchased in the state. Plaintiff also recommends additional viable alternatives and suggests that a good starting point for Defendants would be the "vigorous enforcement of the only recently enacted law against retailer fraud."

Furthermore, the nine other states that have instituted bottle deposit laws seemed to have adopted regulations without imposing any criminal or civil penalties on in-state or out-of-state manufacturers and distributors.[6] Although these alternative approaches may or may not be less desirable or may potentially raise other concerns, Defendants failed to consider reasonable alternatives before first committing themselves to a problematical course by implementing an invalid provision on extraterritorial grounds.

As we previously indicated, our analysis of the extraterritorial effect of the State's unique-mark provision requires a consideration of "how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would

---

[6]*See* Cal. Pub. Res. Code § 14500 (2012) *et seq*.; Conn. Gen. Stat. § 22a-243 (2012) *et seq*.; Haw. Rev. Stat. § 342G-101 (2012) *et. seq*.; Iowa Code § 455C.1 (2012) *et seq*.; ME. Rev. Stat. 32 § 1861 (2011) *et seq*; MA. Gen. Laws 94 § 321 (2012) *et seq*., N.Y. Envtl. Conserv. Law § 27-1001 (2012) *et seq*.; OR. Rev. Stat. § 459A.700 (2012) *et seq*.; VT. Stat. Ann. 10 § 1521 (2012) *et seq*. To be clear, Michigan's ten-cent deposit per beverage container contributes to the State's high redemption rate inasmuch as Michigan provides a higher refund value than all of the other participating states, with the exception of California, which administers ten-cent refunds for bottles 24 ounces or greater. Even so, no other state with a beverage container deposit law attempts to burden the beverage industry by forcing them to apply a unique-mark to their beverage containers in order to enter the Michigan market.

arise if not one, but many or every, State adopted similar legislation." *Healy*, 491 U.S. at 336. Plaintiff argues that additional extraterritorial problems triggered by the unique-mark requirement include the State projecting its regulatory regime into the jurisdiction of another state and the potential destruction of the national common market through the adoption of state-exclusive product laws. Having found that the statute has an impermissible extraterritorial effect, we have no need to consider whether the state had some legitimate local purpose or whether there is a reasonable nondiscriminatory alternative.[7]

As an initial matter, we recognize that this case presents a novel issue of an "unusual extraterritoriality question" that has not been addressed either by the Supreme Court or any other court. To date, no other state has implemented a requirement similar to Michigan's. However, Defendants' reference to Plaintiff's argument as a "hypothetical inquiry" also deflects attention away from the real issue in that Michigan's unique-mark requirement not only requires beverage companies to package a product unique to Michigan but also allows Michigan to dictate where the product can be sold. The reach of this statute and the criminal penalty for violations cannot be as easily dismissed as suggested by Defendants. Plaintiff must comply with the statute now or face criminal sanctions. In addition, other states must react today to Michigan's unique-mark requirement or also face legal consequences. Thus, Michigan is forcing states to comply with its legislation in order to conduct business within its state, which creates an impermissible extraterritorial effect and is in violation of the Supreme Court's precedent stated in *Brown-Forman* and *Healy*. *See Brown-Forman*, 476 U.S. at 583–84; *Healy*, 491 U.S. at 334; *see also Heald,* 544 U.S. at 473 (finding that Michigan and New York's regulatory schemes contribute to "[t]he current patchwork of laws–with some States banning direct shipments altogether, others doing so only for out-of-state wines, and still others requiring reciprocity . . . invite[s] a multiplication of preferential trade areas destructive of the very purpose of the Commerce Clause.") (quoting *Dean Milk Co.*

---

[7]Because we concluded that Michigan's unique-mark provision does not discriminate against interstate commerce but is extraterritorial, the *Pike* balancing test does not apply. *See Int'l Dairy*, 622 F.3d at 646 (stating that the *Pike* balancing test controls when a state regulation is neither extraterritorial nor discriminatory in effect).

*v. Madison*, 340 U.S. 349, 356 (1951) (internal quotation marks omitted). Therefore, we conclude that the Michigan statute is extraterritorial in violation of the dormant Commerce Clause because it impermissibly regulates interstate commerce by controlling conduct beyond the State of Michigan.

## CONCLUSION

In sum, we conclude that Mich. Comp. Laws § 445.572a(10), the State's unique mark requirement, is not discriminatory. However, because the unique-mark requirement forces manufacturers and distributors of beverage containers to adopt the State's unique labeling system, without the consideration of other less burdensome alternatives, Michigan's unique-mark requirement has an impermissible extraterritorial effect. For these reasons, we **REVERSE** and **REMAND** to the district court with instructions to proceed consistently with this opinion. We also **AFFIRM** the district court's order granting summary judgment to Defendant on the basis that the State statute is not discriminatory.

-----------------------

**CONCURRENCE**

-----------------------

SUTTON, Circuit Judge, concurring.  I join Judge Clay's opinion in full.  I write separately to express skepticism about the extraterritoriality doctrine, the fulcrum of today's decision and a branch of the dormant Commerce Clause that the Supreme Court last referred to nine years ago as the doctrine "applied in *Baldwin* and *Healy*," decisions from 1935 and 1989.  *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003); *see Healy v. Beer Inst.*, 491 U.S. 324 (1989); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935).

A little history helps to explain how the extraterritoriality doctrine became the "dormant branch of the dormant Commerce Clause." *IMS Health Inc. v. Mills*, 616 F.3d 7, 29 n.27 (1st Cir. 2010), *abrogated on other grounds by Sorell v. IMS Health Inc.*, 131 S. Ct. 2653 (2011).  To the founding generation, it was an article of common faith that "no state or nation can, by its laws, directly affect, or bind property out of its own territory, or bind persons not resident therein."  Joseph Story, *Commentary on the Conflict of Laws* § 20 (1834).  A State's power to "protect the lives, health, and property" of its residents was "essentially exclusive," *United States v. E.C. Knight Co.*, 156 U.S. 1, 11 (1895), given the then-modest regulatory authority of the National Government under the Commerce Clause.  And no State could regulate "except with reference to its own jurisdiction" because each State's powers ended at its borders. *Bonaparte v. Tax Court*, 104 U.S. 592, 594 (1881).  On the other side of the dual-sovereignty coin, the Federal Government's power "to regulate commerce among the several states" was "also exclusive." *E.C. Knight*, 156 U.S. at 11.  A structural challenge to a state or federal regulation thus required courts to determine "whether the right government was acting within the right sphere." Ernest A. Young, *"The Ordinary Diet of the Law": The Presumption Against Preemption in the Roberts Court*, 2011 Sup. Ct. Rev. 253, 257.

Over time, the lines between the separate spheres blurred, in part because the nature of commerce changed, in part because the Supreme Court's interpretation of the Commerce Clause changed.  The Federal Government gained power over traditionally "local" activities, ending the States' exclusive regulatory power. *See, e.g.*, *United States v. Darby*, 312 U.S. 100 (1941).  And the States began to regulate commerce that eventually would cross state lines, ending the Federal Government's exclusive authority.  If States did not discriminate against out-of-state interests or disproportionately burden interstate commerce, they could share regulatory authority with the Federal Government, at least so long as Congress did not exercise its option of regulating the area exclusively. *See, e.g.*, *S.C. Highway Dep't v. Barnwell Bros., Inc.*, 303 U.S. 177 (1938) (upholding a state statute regulating the size of trucks using the State's highways despite the law's burden on interstate commerce); *Milk Control Bd. v. Eisenberg*, 306 U.S. 346 (1939) (upholding a state statute setting minimum prices for milk shipped for sale out of state); *Duckworth v. Arkansas*, 314 U.S. 390 (1941) (upholding a state statute requiring a license to transport liquor through the state); *see also* Wiley Rutledge, *A Declaration of Legal Faith* 68 (1947) ("[J]ust as in recent years the permissive scope for congressional commerce action has broadened . . . the prohibitive effect of the clause has been progressively narrowed.  The trend has been toward sustaining state regulation formerly regarded as inconsistent with Congress' unexercised power over commerce.").

One measure of this transformation, from using the Commerce Clause to monitor largely exclusive spheres of authority to overseeing largely overlapping spheres of authority, is this:  Today, a State may fix the price of natural gas drilled within its borders and purchased at the wellhead, even when 90 percent of the gas will be shipped out of state. *Cities Serv. Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179 (1950).  And today the Federal Government may regulate local loan sharking that never crosses state lines. *Perez v. United States*, 402 U.S. 146 (1971).

Which brings me back to extraterritoriality.  Is it possible that the extraterritoriality doctrine, at least as a freestanding branch of the dormant Commerce

Clause, is a relic of the old world with no useful role to play in the new? I am inclined to think so.

When the central function of the dormant Commerce Clause was to keep the States and the Federal Government in their separate spheres of regulatory authority, it made sense to think of extraterritoriality as a relevant proxy for interstate-commerce violations. Extraterritorial lawmaking after all operates on one side of this line and territorial lawmaking operates on the other. But that line has come and gone. The key point of today's dormant Commerce Clause jurisprudence is to prevent States from discriminating against out-of-state entities in favor of in-state ones.

Yet the extraterritoriality doctrine, if taken seriously (or at least as seriously as *Healy* has taken it), has nothing to do with favoritism. Even state laws that neither discriminate against out-of-state interests nor disproportionately burden interstate commerce may run afoul of extraterritoriality, as this case well shows. All three of us agree that the Michigan redemption law does not favor in-state entities at the expense of out-of-state ones, and yet all three of us agree that the law violates the extraterritoriality doctrine applied in *Healy*. That is because, if a State regulates "commerce that takes place wholly outside of the State's borders," that regulation is automatically invalid, no matter how great the regulation's local benefit, no matter how small its out-of-state burden. *Healy*, 491 U.S. at 336; *see also Edgar v. MITE Corp.*, 457 U.S. 624, 642–43 (1982) (plurality opinion) (stating that an extraterritorial regulation of tender offers was invalid "whether or not the commerce has effects within the State"); *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 583 (1986) (striking down New York's price-affirmation law based on its extraterritorial effect). Even a hypothetical state law that *facilitated* interstate commerce—say, an Ohio law that gave tax credits to automobile companies that keep open the production lines of their factories in Michigan and elsewhere—would be invalid if it had extraterritorial "practical effect[s]." *Healy*, 491 U.S. at 336. Whatever role extraterritoriality once played in Commerce Clause law, it is difficult to perceive the interstate-commerce function it plays today.

Not just the original function of the extraterritoriality doctrine has been lost to time; so too has its meaning. The modern reality is that the States frequently regulate activities that occur entirely within one State but that have effects in many. To take one example, California sets high emission standards for cars sold in its State, a set of regulations that affects automobile prices across the country. *See Chamber of Commerce v. EPA*, 642 F.3d 192, 197–98 (D.C. Cir. 2011). This state law undoubtedly has the "practical effect," *Healy*, 491 U.S. at 336, of impacting car companies located in any State with lower emission standards—which is to say all of them—and thus has extraterritorial effects. Faced with this discrepancy in state emission standards, national car manufacturers have three choices: (1) produce California models and rest-of-country models, spreading the costs of maintaining two separate production and distribution networks across consumers nationwide; (2) sell only California-compliant cars and pass the higher costs of production on to consumers nationwide; or (3) stop selling cars in California entirely, shutting the State off from the stream of commerce and depriving consumers of the economies of scale generated by a national automobile market. All three options practically impact businesses and commerce in other States.

California is not unique, and emission standards are not the only area where this problem arises. Ohio requires state-specific milk labels. *Int'l Dairy Foods Ass'n v. Boggs*, 622 F.3d 628 (6th Cir. 2010). Vermont insists that light bulbs come with labels warning of the dangers of mercury. *Nat'l Elec. Mfrs. Ass'n v. Sorrell*, 272 F.3d 104 (2d Cir. 2001). And many States tax businesses that operate across state lines. *See, e.g.*, *Meadwestvaco Corp. ex rel Mead Corp. v. Ill. Dep't of Revenue*, 553 U.S. 16, 24–25 (2008).

If, in the absence of preemptive federal legislation, these laws and others like them do not violate the extraterritoriality doctrine of *Healy*, why not? Their effect is no less direct than the Michigan unique-mark requirement we invalidate today. What divides impermissible "direct" extraterritorial laws from permissible "indirect" ones? I cannot tell, and I do not think *Healy*'s suggestion to look to the "practical effect" of the regulation offers any meaningful guidance. 491 U.S. at 336.

What's more, we already have an ineffable test for invalidating some state regulations but not others that affect interstate commerce. State regulations that burden, but that do not facially discriminate against, interstate commerce must survive *Pike* balancing, which requires a State to show that the in-state regulatory benefits of a law outweigh the out-of-state burdens the law places on interstate commerce. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). The inquiry asks courts to balance interests they are ill-equipped to measure, let alone to compare. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 619 (1997) (Thomas, J., dissenting) (noting that balancing "invites us, if not compels us, to function more as legislators than as judges"); *Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring) (pointing out that *Pike* reduces courts to asking "whether a particular line is longer than a particular rock is heavy").

Why have *two tests* that suffer from these problems rather than just one? If *Pike* is problematic for this reason, so too is the extraterritoriality doctrine. The original function of the doctrine no longer exists, and it is exceedingly difficult to understand which extraterritorial effects exceed its bounds and which do not—except through a "practical effect" inquiry that shares many of the same traits and pitfalls as *Pike* balancing. For the judge who thinks little of *Pike* balancing and little of the judicial capacity to weigh apples-and-oranges interests neutrally, it is difficult to see the justification for preserving a "practical effect" extraterritoriality inquiry. And for the judge who wants to preserve *Pike* balancing, it is difficult to see what *additional* purpose is served by imposing the extraterritoriality inquiry as well. In the absence of a clear purpose or meaning, extraterritoriality provides a "roving license for federal courts to determine what activities are appropriate for state and local government to undertake." *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Auth.*, 550 U.S. 330, 343 (2007).

Eliminating extraterritoriality as a freestanding Commerce Clause prohibition also would not eliminate the role of territory in constitutional law. Territorial limits on lawmaking underlie, indeed animate, many other constitutional imperatives. The most

powerful of these, due process, limits a State's power to extend its law outside its borders.  A State must have at least some contact with a defendant to exercise personal jurisdiction, *see World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293–94 (1980); its courts may not impose punitive damages that are "grossly excessive" to the State's interest in the conduct underlying a lawsuit, *BMW of N. Am. v. Gore*, 517 U.S. 559, 569 (1996); and it can criminalize only conduct that produces "detrimental effects" within its borders, *Strassheim v. Daily*, 221 U.S. 280, 285 (1911).  Even if Ohio, for instance, made it illegal for its citizens to gamble, the State could not prosecute Nevada casinos for letting Buckeyes play blackjack.  *See Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660, 666 (7th Cir. 2010).

The Full Faith and Credit Clause underscores a related geographical limitation on the States' police power.  States must respect "public acts which are within the legislative jurisdiction of the enacting State," but they face no similar imperative for extraterritorial laws.  *Bradford Elec. Light Co. v. Clapper*, 286 U.S. 145, 156 (1932). The Extradition Clause likewise presupposes territorial lawmaking limits when it speaks of the "State having Jurisdiction of the Crime," U.S. Const., art. IV § 2, and the Sixth Amendment requires that defendants receive a trial "by an impartial jury of the State and district wherein the crime shall have been committed," U.S. Const. amend. VI.  Indeed, one of the American colonists' indictments of King George III was that he "combined with others to subject us to a Jurisdiction foreign to our Constitution, and unacknowledged by our Laws."  The Declaration of Independence para. 15 (U.S. 1776).

Although extraterritoriality underlies these constitutional imperatives, it carries no freestanding weight outside of them.  A law that does not discriminate against interstate commerce, that complies with the traditional requirements of due process and that complies with these other limitations, it seems to me, should not be invalidated solely because of an extraterritorial effect.  *See, e.g.*, *Alaska Packers Ass'n v. Indus. Accident Comm'n*, 294 U.S. 532, 541–42 (1935).

Eliminating extraterritoriality as a freestanding Commerce Clause prohibition also would not change case outcomes.  In *Healy*, extraterritoriality was an alternative

holding. The Court independently held that Connecticut's law discriminated against brewers who engaged in interstate commerce because "a manufacturer or shipper of beer is free to charge wholesalers within Connecticut whatever price it might choose so long as that manufacturer or shipper does not sell its beer in a border State." 491 U.S. at 341. Justice Scalia, indeed, joined the anti-discrimination holding but not the extraterritoriality one, concluding that the Court should have resolved the case solely on the former ground. *See id.* at 345 (Scalia, J., concurring). Nor was the extraterritoriality doctrine indispensable to the other cases. The New York price-affirmation law at issue in *Brown-Forman* affected only distillers who sold in other States, 476 U.S. at 576, and the Illinois law in *Edgar* was a "direct restraint on interstate commerce" that would have "thoroughly stifled" the ability of out-of-state corporations to make tender offers, 457 U.S. at 642. Even *Baldwin*, the case sometimes called the father of the modern extraterritoriality doctrine (though it never used the term), dealt with a state law that was the "equivalent to a rampart of customs duties designed to neutralize advantages belonging to the place of origin." 294 U.S. at 527. All told, I am not aware of a single Supreme Court dormant Commerce Clause holding that relied exclusively on the extraterritoriality doctrine to invalidate a state law.

Nor is there anything special about the Michigan redemption law that ought to make it unconstitutional under the extraterritoriality doctrine but not the traditional dormant Commerce Clause doctrine or some other constitutional guarantee. The law does not discriminate against interstate commerce by favoring in-state bottlers at the expense of out-of-state ones. Even though the unique-mark requirement serves a vital state interest and imposes only a minuscule burden on interstate commerce, its extraterritorial effect appears to doom it. No one, the plaintiffs included, doubts that Michigan may enact a bottle-deposit law under the American Constitution. But extraterritoriality and extraterritoriality alone bars Michigan from the option it believes will best make its bottle-deposit scheme effective.

Michigan, perversely enough, could have chosen to reduce bottle-deposit fraud by enacting regulations far more hurtful to interstate commerce yet not extraterritorial.

The State might have required beverage manufacturers to place a large "Made for Sale in Michigan" label on their products, demanded a burdensome warning label or mandated that manufacturers sell bottles in unusual sizes and shapes that fit only Michigan bottle-redemption machines. So long as those regulations survived *Pike* balancing, they would be constitutionally permissible. *See, e.g.*, *Int'l Dairy*, 622 F.3d at 648–49; *Sorrell*, 272 F.3d at 108–09. Michigan instead chose a nondiscriminatory method premised on compliance in other States, a seeming requirement of *any* innocuous unique-mark requirement. It is only a non-innocuous unique-mark requirement—the more offensive to the bottler the better—that frees Michigan from having to worry about fraudulent redemptions arising from non-unique-mark sales in other States. How strange. The Michigan law penalizes manufacturers who bottle soda cans in Ohio and sell them in Ohio but happen to use a Michigan mark. Extraterritoriality—nominally an offshoot of the Commerce Clause—thus requires courts to strike down a nondiscriminatory state law that affects a purely intrastate transaction. Whatever problem such a law poses, I am hard-pressed to understand why the dormant-dormant Commerce Clause should regulate it.

---
**CONCURRENCE**
---

RICE, District Judge, concurring.  I concur in Judge Clay's opinion, but I write separately for two reasons.  First, Judge Clay does not address the case of *National Electrical Manufacturers Association v. Sorrell*, 272 F.3d 104 (2d Cir. 2001), heavily relied upon by the district court in holding that Michigan's statute was not extraterritorial.

*Sorrell* involved a Vermont statute that required manufacturers of products containing mercury to label the products as such and to direct consumers to recycle the products or dispose of them as hazardous waste.  The court found that the statute did not have the practical effect of regulating interstate commerce.  It rejected the manufacturers' claim that the statute essentially required them to so label all products regardless of where they were sold, noting that manufacturers could choose to modify their production and distribution systems to differentiate between those products bound for Vermont and those that were not.  The court also rejected a claim that the manufacturers could be exposed to multiple, inconsistent labeling requirements imposed by other States, noting that a *risk* of conflicting statutes was insufficient.  Rather, there had to be an *actual* conflict, and none was shown.  *Id.* at 112.

Seizing on this language from *Sorrell*, the district court held that because no other State has enacted a "unique mark" requirement, the ABA could not show that Michigan's statute *actually* conflicts with requirements imposed by any other State.  The district court's reliance on *Sorrell* is misplaced.  Under the circumstances presented here, whether or not manufacturers are, in fact, subject to inconsistent labeling requirements, the potential for havoc certainly exists.  Notably, in *Healy v. Beer Institute*, 491 U.S. 324 (1989), there was no actual conflict at issue.  Nevertheless, the Supreme Court noted that it had to consider "what effect would arise if not one, but many or every, State adopted similar legislation."  *Id.* at 336.

Michigan does not get a "free pass" to enact extraterritorial legislation just because it is the first State to do so. The statute at issue controls conduct beyond Michigan's borders by impliedly requiring manufacturers to use a different label everywhere else. In contrast to *Sorrell*, where manufacturers had the option of using the State-compliant label nationwide, manufacturers have no such option under Michigan's law.

I also write separately to clarify that because we have found the statute to be extraterritorial, it must be struck down, and that is the end of the inquiry. It appears that the parties and the district court all assumed that if the statute were found to be *either* discriminatory *or* extraterritorial, the next step would be to determine whether it nevertheless "advances a legitimate local purpose that cannot be adequately served by reasonable non-discriminatory alternatives." *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008).[1] This additional inquiry, however, applies only to statutes that are deemed discriminatory. It has no application to a statute that has been deemed extraterritorial. To the extent that Part II(B) of the majority opinion implies otherwise, in stating that "no other efforts were made by Defendants that could potentially satisfy the state's purported legitimate purpose in a non-extraterritorial fashion," I believe that some clarification is helpful.

---

[1] This inquiry is completely separate from the *Pike* balancing test, which applies only when the statute is neither discriminatory nor extraterritorial.