FILED
United States Court of Appeals
Tenth Circuit

July 13, 2015

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

ENERGY AND ENVIRONMENT
LEGAL INSTITUTE; ROD LUECK,

     Plaintiffs - Appellants,

v.

JOSHUA EPEL; JAMES TARPEY;
PAMELA PATTON, in their official
capacities as Commissioners of the
Colorado Public Utilities Commission,

     Defendants - Appellees,

and

ENVIRONMENT COLORADO;
CONSERVATION COLORADO
EDUCATION FUND; SIERRA
CLUB; THE WILDERNESS
SOCIETY; SOLAR ENERGY
INDUSTRIES ASSOCIATION;
INTERWEST ENERGY ALLIANCE,

     Defendants Intervenors -
Appellees.

No. 14-1216

Appeal from the United States District Court
for the District of Colorado
(D.C. No. 1:11-CV-00859-WJM-BNB)

David W. Schnare of Free Market Environmental Law Clinic, Burke, Virginia (Michael D. Pepson of Cause of Action, Washington, D.C., with him on the briefs) for Plaintiffs-Appellants.

Will V. Allen, Assistant Attorney General, Denver, Colorado, for Defendants-Appellees.

John E. Putnam of Kaplan Kirsch & Rockwell LLP, Denver, Colorado, (Neil Levine, Denver, Colorado; Michael S. Freeman and Michael A. Hiatt of Earthjustice, Denver, Colorado; and Erin Overturf of Western Resource Advocates, Boulder, Colorado, with him on the brief), for Defendants Intervenors-Appellees.

---

Before **TYMKOVICH, EBEL,** and **GORSUCH,** Circuit Judges.

---

**GORSUCH,** Circuit Judge.

---

Can Colorado's renewable energy mandate survive an encounter with the most dormant doctrine in dormant commerce clause jurisprudence? State law requires electricity generators to ensure that 20% of the electricity they sell to Colorado consumers comes from renewable sources. Under the law, too, this number will rise over time. It may be that Colorado's scheme will require Coloradans to pay more for electricity, but that's a cost they are apparently happy to bear for the ballot initiative proposing the renewable energy mandate passed with overwhelming support. So what does this policy choice by Coloradans affecting Colorado energy consumption preferences and Colorado consumer prices have to do with the United States Constitution and its provisions regarding interstate commerce? The Energy and Environment Legal Institute points out that

Colorado consumers receive their electricity from an interconnected grid serving eleven states and portions of Canada and Mexico. Because electricity can go anywhere on the grid and come from anywhere on the grid, and because Colorado is a net importer of electricity, Colorado's renewable energy mandate effectively means some out-of-state coal producers, like an EELI member, will lose business with out-of-state utilities who feed their power onto the grid. And this harm to out-of-state coal producers, EELI says, amounts to a violation of one of the three branches of dormant commerce clause jurisprudence.

In the end, the district court disagreed with EELI's assessment and so must we.

\*

The Constitution extends to Congress the power to "regulate Commerce . . . among the several states." U.S. Const. art. I, § 8, cl. 3. Most everyone accepts that this language grants Congress authority to pass laws concerning interstate commerce and to direct courts to disregard state laws that impede its own. U.S. Const. art. VI, cl. 2; *see also Gibbons v. Ogden*, 22 U.S. (9 Wheat.) 1 (1824). Yet some see even more than that here. For many years — perhaps since *Gibbons* and at least since *Cooley v. Board of Wardens*, 53 U.S. (12 How.) 299 (1851) — the Supreme Court has read the clause as embodying a sort of judicial free trade policy. Employing what's sometimes called "dormant" or "negative" commerce clause jurisprudence, judges have claimed the authority to strike down state laws

that, in their judgment, unduly interfere with interstate commerce. Detractors find dormant commerce clause doctrine absent from the Constitution's text and incompatible with its structure. *See, e.g.*, *Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1808 (2015) (Scalia, J., dissenting); *Hillside Dairy, Inc. v. Lyons*, 539 U.S. 59, 68 (2003) (Thomas, J., concurring in part and dissenting in part). But as an inferior court we take Supreme Court precedent as we find it and dormant commerce clause jurisprudence remains very much alive today, as but a glance at this term's slip opinions will confirm. *See, e.g., Wynne*, 135 S. Ct. at 1792 (majority opinion).

On the usual telling, dormant commerce clause cases are said to come in three varieties. The farthest reaching of these may be associated with *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). There the Court read the Commerce Clause as allowing judges to strike down state laws burdening interstate commerce when they find insufficient offsetting local benefits. By any reckoning, that's a pretty grand, even "ineffable," all-things-considered sort of test, one requiring judges (to attempt) to compare wholly incommensurable goods for wholly different populations (measuring the burdens on out-of-staters against the benefits to in-staters). *Am. Beverage Ass'n v. Snyder*, 735 F.3d 362, 379 (6th Cir. 2013) (Sutton, J., concurring). Whether because of the difficulties associated with applying such an unwieldy test or for some other reason, the Court has devised two firmer rules applicable to discrete subsets of cases. The first might

be associated with cases like *City of Philadelphia v. New Jersey*, 437 U.S. 617 (1978), and applies to state laws that "clearly discriminate" against out-of-staters. *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 274 (1988). Legislation of this stripe is condemned as "virtually invalid *per se* and can survive only if the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism." *KT & G Corp. v. Att'y Gen. of Okla.*, 535 F.3d 1114, 1143 (10th Cir. 2008) (quoting *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 168 (2d Cir. 2005)). The second finds its roots in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511 (1935), and is said to apply to certain price control and price affirmation laws that control "extraterritorial" conduct — that is, conduct outside the state's borders. Here too laws of that sort are deemed almost *per se* invalid. *KT & G. Corp.*, 535 F.3d at 1143.

It might be fair to describe the law as it's developed in this area a bit like the law as it's developed in antitrust, another pocket of federal jurisprudence characterized by a long and evolving history of almost common-law-like judicial decisionmaking. As there we find here a kind of "rule of reason" balancing test providing the background rule of decision with more demanding "*per se*" rules applied to discrete subsets of cases where, over time, the Court has developed confidence that the challenged conduct is almost always likely to prove problematic and a more laborious inquiry isn't worth the cost. *See, e.g.*, *Broad. Music, Inc. v. Columbia Broad. Sys., Inc.*, 441 U.S. 1, 8-9 (1979) ("[I]t is only

-5-

after considerable experience with certain business relationships that courts classify them as *per se* violations" rather than apply the "rule of reason" to them (internal quotation marks omitted)).

Before us in this case only the final, *Baldwin,* test is at issue. Yes, EELI asked the district court to invalidate Colorado's law under all three tests, *Pike*, *Philadelphia*, and *Baldwin*. Yes, the district court rejected all three arguments. But for reasons known only to it, EELI has appealed just the district court's disposition under *Baldwin*. So whether Colorado's law survives the *Pike* or *Philadelphia* tests may be interesting questions, but they are ones that will have to await resolution in some other case some other day.

*Baldwin*'s extraterritoriality principle may be the least understood of the Court's three strands of dormant commerce clause jurisprudence. *See* Donald H. Regan, *Siamese Essays: (I)* CTS Corp. v. Dynamics Corp. of America *and Dormant Commerce Clause Doctrine; (II) Extraterritorial State Legislation*, 85 Mich. L. Rev. 1865, 1884 (1987). It is certainly the most dormant for, though the Supreme Court has cited *Baldwin* in passing a number of times, a majority has used its extraterritoriality principle to strike down state laws only three times. *IMS Health, Inc. v. Mills*, 616 F.3d 7, 29 n.27 (1st Cir. 2010), *vacated on other grounds sub nom. IMS Health, Inc. v. Schneider*, 131 S. Ct. 3091 (2011).

What do these three cases have in common? In *Baldwin*, New York prohibited out-state companies from selling milk in the State unless they

-6-

purchased their milk from dairy farmers at the same price paid to New York dairy farmers — all to insulate the in-state dairy industry from price competition by out-of-state producers. In *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573 (1986), New York law required liquor merchants to list their prices once a month and affirm that the prices they charged in New York were no higher than those they charged in other states. Because a seller couldn't lower price elsewhere without first doing so in New York on its monthly timetable, the scheme had the effect of preventing price competition out-of-state. In *Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989), the Court struck down another price affirmation scheme that, due to its interaction with similar regulations elsewhere, again had the effect of inhibiting out-of-state price competition. In all three cases, then, the Court thus faced (1) a price control or price affirmation regulation, (2) linking in-state prices to those charged elsewhere, with (3) the effect of raising costs for out-of-state consumers or rival businesses. *See id.* at 339 ("States may not deprive businesses and consumers in other States of 'whatever competitive advantages they may possess' based on the conditions of the local market." (quoting *Brown-Forman*, 476 U.S. at 580 (citing *Baldwin*, 294 U.S. at 528))).

In this light, you might ask whether the *Baldwin* line of cases is really a distinct line of dormant commerce clause jurisprudence at all. The usual telling of the law in this area suggests it is one of three separate strands of authority.

But a careful look at the holdings in the three leading cases suggests a concern with preventing discrimination against out-of-state rivals or consumers. And given this, one might see *Baldwin* and its progeny as no more than instantiations of the *Philadelphia* anti-discrimination rule. In this vein it's worth noting that *Baldwin* was decided before the anti-discrimination rule solidified and might be said simply to have anticipated it. Indeed, one of the Court's earliest anti-discrimination cases, *Dean Milk Co. v. City of Madison*, conceived of *Baldwin* in just this way. 340 U.S. 349, 353-54 (1951). *Healy* applied *Baldwin*'s rule only as an alternative holding to an application of anti-discrimination doctrine, 491 U.S. at 335-41 — and only over the objection that the *Baldwin* analysis was therefore unnecessary, *id.* at 344-45 (Scalia, J., concurring in part and concurring in the judgment). And you might even read *Brown-Forman* — where *Baldwin*'s rule seemed to do the most independent work — as treating *Baldwin* simply as an application of the anti-discrimination rule. *See* 476 U.S. at 580 (discussing *Baldwin* together with anti-discrimination cases).

But whatever doctrinal pigeonhole you choose to place them in, we don't see how *Baldwin*, *Healy*, and *Brown-Forman* require us to strike down Colorado's mandate. For that mandate just doesn't share any of the three essential characteristics that mark those cases: it isn't a price control statute, it doesn't link prices paid in Colorado with those paid out of state, and it does not discriminate against out-of-staters. EELI doesn't even seriously attempt to

suggest otherwise. While Colorado's mandate surely regulates the quality of a good sold to in-state residents, it doesn't directly regulate price in-state or anywhere for that matter. And state laws setting non-price standards for products sold in-state (standards concerning, for example, quality, labeling, health, or safety) may be amenable to scrutiny under the generally applicable *Pike* balancing test, or scrutinized for traces of discrimination under *Philadelphia*, but the Court has never suggested they trigger near-automatic condemnation under *Baldwin*.

In saying this much, we hardly mean to suggest non-price regulations don't impact price in or out of state. In today's interconnected national marketplace such a suggestion would be beyond naive. We readily recognize that state regulations nominally concerning things other than price will often have ripple effects, including price effects, both in-state and elsewhere. So, for example, when one or more states impose quality mandates manufacturers may find the cheapest way to comply isn't to produce a special product for them but to redesign their product as it's sold nationwide, with an increased cost felt by consumers everywhere. Still, without a regulation more blatantly regulating price and discriminating against out-of-state consumers or producers, *Baldwin*'s near *per se* rule doesn't apply. *See generally Quik Payday, Inc. v. Stork*, 549 F.3d 1302 (10th Cir. 2008); *Snyder*, 735 F.3d at 379 (Sutton, J., concurring).

The reason, again, takes us to the question of certainty. In antitrust many agreements among market participants will affect price and all may be scrutinized

under the rule of reason test. It's only when the parties' agreement involves "naked price fixing" or something else experience teaches to be clearly invidious that we will forgo that searching inquiry in favor of a shortcut and declare the agreement *per se* anticompetitive. *See NCAA v. Bd. of Regents*, 468 U.S. 85, 100-01 (1984). Similarly here, state regulations and standards across a wide spectrum may invite *Pike* balancing. But only price control or price affirmation statutes that link in-state prices with those charged elsewhere and discriminate against out-of-staters are considered by the Court so obviously inimical to interstate commerce that we will forgo that more searching inquiry in favor of *Baldwin*'s shortcut.

Our case illustrates the point. How can we have the sort of steadfast conviction the *Baldwin* Court did that interstate commerce will be harmed when, if anything, Colorado's mandate seems most obviously calculated to raise price for *in-state* consumers? EELI offers no story suggesting how Colorado's mandate disproportionately harms out-of-state businesses. To be sure, fossil fuel producers like EELI's member will be hurt. But as far as we know, all fossil fuel producers in the area served by the grid will be hurt equally and all renewable energy producers in the area will be helped equally. If there's any disproportionate adverse effect felt by out-of-state producers or any disproportionate advantage enjoyed by in-state producers, it hasn't been explained to this court. And it's far from clear how the mandate might hurt out-of-state

-10-

consumers either. The mandate does have the effect of increasing demand for electricity generated using renewable sources and (under the law of demand) you might expect that to lead to higher prices for electricity of that sort for everyone in the market (here, presumably, everyone connected to the grid). But the mandate also reduces demand for and might be expected to reduce the price everyone in the market has to pay for electricity generated using fossil fuels. So the net price impact on out-of-state consumers is far from obviously negative and, for all we know, may tip in favor of those willing to shift usage toward fossil fuel generated electricity. To reach hastily for *Baldwin*'s *per se* rule, then, might lead to the decidedly awkward result of striking down as an improper burden on interstate commerce a law that may not disadvantage out-of-state businesses and that may actually reduce price for out-of-state consumers.

We acknowledge that EELI reads *Baldwin*, *Brown-Forman*, and *Healy* as standing for a (far) grander proposition than we do. Exploiting dicta in *Healy*, EELI contends that these cases require us to declare "automatically" unconstitutional any state regulation with the practical effect of "control[ling] conduct beyond the boundaries of the State." *See* Br. for Appellants at 30 (quoting *Healy*, 491 U.S. at 336) (emphasis omitted). But, as we've explained, the Court's holdings have not gone nearly so far and have turned instead on the presence of three factors not present here. In fact, the Supreme Court has emphasized as we do that the *Baldwin* line of cases concerns only "price control

-11-

or price affirmation statutes" that involve "tying the price of . . . in-state products to out-of-state prices." *Pharm. Research & Mfrs. of Am. v. Walsh*, 538 U.S. 644, 669 (2003). The Ninth Circuit has made the same point, too, explaining that "*Healy* and *Baldwin* are not applicable to a statute that does not dictate the price of a product and does not 't[ie] the price of its in-state products to out-of-state prices.'" *Assoc. des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 951 (9th Cir. 2013) (quoting *Walsh*, 538 U.S. at 669).

EELI's contrary position would also risk serious problems of overinclusion. After all, if any state regulation that "control[s] . . . conduct" out of state is *per se* unconstitutional, wouldn't we have to strike down state health and safety regulations that require out-of-state manufacturers to alter their designs or labels? *See supra* at 9. Certainly EELI offers no limiting principle that might prevent that possibility or others like it. Instead, it seems to embrace such results and, in this way, it seems to call on us not merely to respect the actual holdings of the most dormant authorities in all of dormant commerce clause jurisprudence but to revive and rebuild them on the basis of dicta into a weapon far more powerful than *Pike* or *Philadelphia*. That's an audacious invitation we think the Court unlikely to take up, especially given its remarks about the limits of *Baldwin* doctrine in *Walsh*, and it's a novel lawmaking project we decline to take up on our own. *See* Brannon P. Denning, *Extraterritoriality and the Dormant Commerce Clause: A Doctrinal Post-Mortem*, 73 La. L. Rev. 979, 998-99 (2013)

(noting the "lack of a limiting principle" in the "sweeping" dicta in *Healy* on which EELI relies); Jack L. Goldsmith & Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 806 & n.90 (2001) (characterizing that dicta as "overbroad").[1]

*

If it cannot prevail on substance, EELI pins its hopes on a separate procedural complaint. The dormant commerce clause question comes to us by way of the district court's ruling on Colorado's motion for summary judgment. As part of its opposition to Colorado's summary judgment motion in district court, EELI said the motion was premature, more discovery was necessary, and it filed an affidavit pursuant to Fed. R. Civ. P. 56(d) asking the court to defer its ruling until that additional discovery could take place. The district court rejected EELI's suggestion. This, EELI says, was improper, leaving it without sufficient time to prepare and the case should be remanded for further discovery.

---

[1] Colorado briefly questions whether EELI has suffered an "injury-in-fact" sufficient to afford it Article III standing to pursue its dormant commerce clause challenge. But Colorado defers this potentially dispositive jurisdictional argument, usually something parties present right up front, to the end of its brief. And it does so for a reason. EELI member Alpha sells coal to Colorado electricity generators and by all accounts Colorado's law reduces the demand for coal and limits the portion of the Colorado electricity-generation market Alpha may serve. Many cases confirm this is more than enough to satisfy Article III's "injury-in-fact" requirement. *See, e.g.*, *Clinton v. City of New York*, 524 U.S. 417, 432-33 (1998); *N.E. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993).

In one respect EELI has a point. The district court stated that its written "practice standards" require parties who want the court to do anything to file a separate piece of paper denominated a "motion." Because EELI didn't file such a paper requesting a deferral of decision on the summary judgment motion — a motion to defer a motion, if you will — the district court ruled that the group's request was procedurally deficient and could be rejected on this basis alone.

This much was in error. The Federal Rules of Civil Procedure allow a good deal of leeway for local rules and individual judicial practice standards. But the rules also show a degree of mercy for the practicing lawyer who, like the medieval glossator, must account not just for the text but all the marginalia surrounding it — in this case not only all the federal rules, but all the advisory notes that underlie them, all the local rules on top of them, all the individual judicial practice standards that accompany them — not to mention all the (often most important and individualized) unwritten rules that apply in every courtroom. *See generally* William H. Erickson, *Colorado's Answer to the Local Rules Problem*, 16 U. Mich. J.L. Reform 493 (1983) (discussing the challenges lawyers face by the proliferation of rules). The federal rules specify that district courts may create additional procedural rules only if and to the extent they are "consistent with" the federal rules themselves. Fed. R. Civ. P. 83(a)(1). And that mandate poses a problem here. For the federal summary judgment rule expressly specifies that, when you think summary judgment is premature and should wait

-14-

for additional discovery, you may present an "affidavit or declaration" to register the point. Fed. R. Civ. P. 56(d). The district court may be able to specify a different form of submission when the federal rules do not speak to the question. The district court may even allow the parties to present a request for additional discovery by way of a formally denominated "motion" as well as by "affidavit or declaration." All these results might be "consistent with" the federal rules. But we don't see how the district court could hold an affidavit or declaration insufficient to request the deferral of a summary judgment motion when the federal rules expressly indicate that those modes of communication are sufficient to the task. By any fair account, that's just not "consistent with" what the federal rules say and we remind the district courts within our jurisdiction that their considerable leeway for personal practice and local rules remains subject to Rule 83. *Cf. Reed v. Bennett*, 312 F.3d 1190, 1194-95 (10th Cir. 2002) (Rule 83 prohibits a district court from granting a summary judgment motion based only on a local rule deeming failure to respond to a motion consent to the relief it seeks).

The district court, however, did offer an alternative ground for denying the Rule 56(d) request. And here it had the better of it. EELI filed its Rule 56(d) affidavit seeking more time for discovery in October 2013. Yet discovery didn't close until January 2014 and the district court didn't get around to ruling on the motion until May 2014. So while EELI may have fairly conveyed its need for more discovery as of October 2013, it wound up getting exactly what it asked for:

-15-

months more of discovery. And not once at any point did EELI seek to supplement its summary judgment opposition papers with new evidence acquired from the additional discovery it received — even as it repeatedly called the district court's attention to additional and new legal authorities. Neither did EELI seek to explain to the district court after January 2014 what discovery (if any) it still needed by that point. Given these facts, the district court said it saw "no reason to defer ruling" on the motion past May 2014. This conclusion we find hard to fault, especially given that even now EELI is unable to cite to this court any discovery that it needed but lacked time to pursue after the close of discovery in January 2014. Indeed, in similar cases we have held that the district court did not abuse its discretion in proceeding to rule and we cannot find a sound reason to distinguish them here. *See, e.g.*, *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1114 (10th Cir. 2009); *Wilson v. Vill. of Los Lunas*, 572 F. App'x 635, 637-40 (10th Cir. 2014). So it is that, by the end of it all, we fail to see here any procedural or substantive error that might warrant reversal.

The judgment is affirmed.