THACKER, Circuit Judge:
 

 The Association for Accessible Medicines ("AAM") appeals the district court's dismissal of its dormant commerce clause challenge to a Maryland statute prohibiting price gouging in the sale of prescription drugs. AAM also appeals the district court's refusal to enjoin enforcement of the statute on the basis that it is unconstitutionally vague. We hold that the statute violates the dormant commerce clause because it directly regulates the price of transactions that occur outside Maryland.
 
 [1]
 
 Accordingly, we reverse the district court's dismissal of that claim and remand with instructions to enter judgment in favor of AAM.
 

 I.
 

 Factual Background and Procedural History
 

 A.
 

 Maryland's Anti-Price Gouging Statute
 

 In response to reports of price gouging by pharmaceutical manufacturers in the sale of certain prescription medications, Maryland's legislature passed HB 631, "An Act concerning Public Health-Essential Off-Patent or Generic Drugs-Price Gouging-Prohibition" (the "Act"), during the 2017 legislative session. J.A. 42-48.
 
 [2]
 
 Maryland's governor refused to sign the bill, citing constitutional and other concerns, and the bill became law without his signature. The Act went into effect on October 1, 2017.
 

 The Act prohibits "[a] manufacturer or wholesale distributor" from "engag[ing] in price gouging in the sale of an essential off-patent or generic drug."
 
 Md. Code Ann., Health-General § 2-802
 
 (a). The Act defines "price gouging" as "an unconscionable increase in the price of a prescription drug."
 

 Id.
 

 § 2-801(c). "Unconscionable increase" is further defined as an increase that "[i]s excessive and not justified by the cost of producing the drug or the cost of appropriate expansion of access to the drug to promote public health" and "[r]esults in consumers ... having no meaningful choice about whether to purchase the drug at an excessive price" due to the drug's "importance ... to their health" and "[i]nsufficient competition in the market."
 

 Id.
 

 § 2-801(f). The "essential" medications subject to the law are those "made available for sale in [Maryland]" that either "appear[ ] on the Model List of Essential Medicines most recently adopted by the World Health Organization" or are "designated ... as an essential medicine due to [their] efficacy in treating a life-threatening health condition or a chronic health condition that substantially impairs an individual's ability to engage in activities of daily living."
 

 Id.
 

 § 2-801(b)(1).
 

 A manufacturer or wholesale distributor determined to be in violation of the Act may face a number of legal consequences, including a civil penalty of $10,000 per violation or an action to enjoin the sale of the medication at the increased price.
 
 See
 

 Md. Code Ann., Health-General § 2-803
 
 (d). To assist the Maryland Attorney General in identifying violations, the Act provides that the Maryland Medical Assistance Program "may notify the Attorney
 General" in the event of a particular price increase, including when an increase "[w]ould result in an increase of 50% or more in the wholesale acquisition cost of the drug within the preceding 1-year period" or when a 30-day supply of the drug "would cost more than $80 at the drug's wholesale acquisition cost."
 

 Id.
 

 § 2-803(a).
 

 B.
 

 AAM's Suit Challenging the Act
 

 AAM is a voluntary organization with a membership that consists of prescription drug manufacturers and wholesale distributors and other entities in the pharmaceutical industry. AAM's member-manufacturers, only one of which is based in Maryland, typically sell their products to wholesale pharmaceutical distributors,
 
 none of which are based in Maryland
 
 . The vast majority of these sales occur outside Maryland's borders.
 

 On July 6, 2017, AAM filed this action against Brian Frosh, Maryland's Attorney General, and Dennis R. Schrader, Secretary of the Maryland Department of Health (collectively, "Maryland"). Among other claims, AAM asserts that the Act violates the dormant commerce clause and is unconstitutionally vague. Maryland filed a motion to dismiss AAM's suit, which the district court granted as to the dormant commerce clause claim but denied as to the vagueness claim. The district court also denied AAM's motion for a preliminary injunction. AAM timely appealed.
 

 II.
 

 Dormant Commerce Clause Challenge
 

 AAM argues that the district court improperly dismissed its claim that the Act violates the dormant commerce clause by directly regulating wholly out-of-state commerce. We review the dismissal de novo, "accepting [AAM's] well-pleaded allegations as true and drawing all reasonable inferences in [AAM's] favor."
 
 Schilling v. Schmidt Baking Co.
 
 ,
 
 876 F.3d 596
 
 , 599 (4th Cir. 2017).
 

 A.
 

 The Dormant Commerce Clause and the Principle Against Extraterritoriality
 

 Implicit in the constitutional allocation of the "Power ... To regulate Commerce ... among the several States," U.S. Const. art. I, § 8, cl. 3, to the federal government is a corollary "constraint on the power of the States to enact legislation that interferes with or burdens interstate commerce."
 
 Brown v. Hovatter
 
 ,
 
 561 F.3d 357
 
 , 362 (4th Cir. 2009). This doctrine, known as the "dormant" commerce clause, "is driven by concern about economic protectionism" and seeks to prevent state "regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors."
 

 Id.
 

 at 363
 
 (quoting
 
 Dep't of Revenue of Ky. v. Davis
 
 ,
 
 553 U.S. 328
 
 , 337-38,
 
 128 S.Ct. 1801
 
 ,
 
 170 L.Ed.2d 685
 
 (2008) ).
 

 The principle against extraterritoriality as it relates to the dormant commerce clause is derived from the notion that "a State may not regulate commerce occurring wholly outside of its borders."
 
 Star Sci., Inc. v. Beales
 
 ,
 
 278 F.3d 339
 
 , 355 (4th Cir. 2002) (citing
 
 Healy v. Beer Inst.
 
 ,
 
 491 U.S. 324
 
 , 335-36,
 
 109 S.Ct. 2491
 
 ,
 
 105 L.Ed.2d 275
 
 (1989) ;
 
 Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.
 
 ,
 
 476 U.S. 573
 
 , 582-83,
 
 106 S.Ct. 2080
 
 ,
 
 90 L.Ed.2d 552
 
 (1986) ;
 
 Edgar v. MITE Corp.
 
 ,
 
 457 U.S. 624
 
 , 642-43,
 
 102 S.Ct. 2629
 
 ,
 
 73 L.Ed.2d 269
 
 (1982) (plurality opinion)). The principle "reflect[s] the Constitution's special concern both with the maintenance of a national economic union unfettered by state-imposed limitations on interstate commerce and with the autonomy of the
 individual States within their respective spheres."
 
 Healy
 
 ,
 
 491 U.S. at 335-36
 
 ,
 
 109 S.Ct. 2491
 
 (footnote omitted). A state law violates the extraterritoriality principle if it either expressly applies to out-of-state commerce,
 
 see
 

 Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.
 
 ,
 
 492 F.3d 484
 
 , 491-92 (4th Cir. 2007), or has that "practical effect," regardless of the legislature's intent,
 
 Star Sci.
 
 ,
 
 278 F.3d at 355
 
 .
 

 1.
 

 One of the earliest cases to address the extraterritoriality principle as it relates to the dormant commerce clause is
 
 Baldwin v. G.A.F. Seelig, Inc.
 
 ,
 
 294 U.S. 511
 
 ,
 
 55 S.Ct. 497
 
 ,
 
 79 L.Ed. 1032
 
 (1935). The New York law at issue in
 
 Baldwin
 
 required milk dealers to pay a minimum amount to milk producers, even when the milk was purchased outside New York.
 
 See
 

 id.
 

 at 519
 
 ,
 
 55 S.Ct. 497
 
 . The parties agreed that "New York ha[d] no power to project its legislation into Vermont by regulating the price to be paid in that state for milk acquired there."
 

 Id.
 

 at 521
 
 ,
 
 55 S.Ct. 497
 
 . In holding that the law violated the dormant commerce clause, the Supreme Court observed that the law essentially operated as a duty on milk produced in other states and therefore unlawfully burdened interstate commerce.
 
 See
 

 id.
 

 at 521-22
 
 ,
 
 55 S.Ct. 497
 
 .
 

 A plurality of the Court expounded on this concept nearly half a century later in
 
 Edgar v. MITE Corp.
 
 ,
 
 457 U.S. 624
 
 ,
 
 102 S.Ct. 2629
 
 ,
 
 73 L.Ed.2d 269
 
 (1982) (plurality opinion). The Illinois law challenged in
 
 Edgar
 
 required "any takeover offer for the shares of a target company [to] be registered with the Secretary of State" if Illinois shareholders owned at least 10% of the company or if the company was organized under Illinois law or headquartered in the state, among other conditions.
 

 Id.
 

 at 626-27
 
 ,
 
 102 S.Ct. 2629
 
 (internal footnote omitted). The Illinois Secretary of State had the authority "to deny registration to a tender offer" under certain circumstances.
 

 Id.
 

 at 627
 
 ,
 
 102 S.Ct. 2629
 
 . The plurality held that the Illinois law violated the dormant commerce clause by "directly regulat[ing] transactions which take place across state lines, even if wholly outside the State of Illinois" because it permitted the Illinois Secretary of State to reject a tender offer even as to those shares not owned by Illinois shareholders.
 

 Id.
 

 at 641-42
 
 ,
 
 102 S.Ct. 2629
 
 . In other words, the law granted the Illinois Secretary of State the ability to intervene in transactions between an out-of-state acquiring company and out-of-state shareholders of the target company when neither the acquiring company nor the target company's shareholders had connections to Illinois.
 

 The Court favorably referenced both
 
 Baldwin
 
 and
 
 Edgar
 
 in
 
 Brown-Forman Distillers Corp. v. New York State Liquor Authority
 
 ,
 
 476 U.S. 573
 
 ,
 
 106 S.Ct. 2080
 
 ,
 
 90 L.Ed.2d 552
 
 (1986). The New York law struck down in
 
 Brown-Forman
 
 "requir[ed] distillers to affirm that they will make no sales anywhere in the United States at a price lower than the posted price in New York," which prohibited the distillers from lowering their prices in other states.
 

 Id.
 

 at 579-80
 
 ,
 
 106 S.Ct. 2080
 
 . The Court noted that the law regulated commerce in other states by controlling liquor prices in those states, which would "effectively force [the distiller] to abandon its promotional allowance program in States in which that program is legal, or force those other States to alter their own regulatory schemes in order to permit [the distiller] to lower its New York prices without violating the affirmation laws of those States."
 

 Id.
 

 at 583-84
 
 ,
 
 106 S.Ct. 2080
 
 . As a result, the law was invalid.
 
 See
 

 id.
 

 at 584
 
 ,
 
 106 S.Ct. 2080
 
 .
 

 Just three years later, the Supreme Court considered a similar Connecticut law in
 
 Healy v. Beer Institute
 
 ,
 
 491 U.S. 324
 
 ,
 
 109 S.Ct. 2491
 
 ,
 
 105 L.Ed.2d 275
 
 (1989). The law, which was aimed at preventing Connecticut residents from crossing state lines to purchase cheaper beer, required beer producers to affirm that their Connecticut prices were, "at the moment of posting, no higher than the prices at which those products are sold in the bordering States."
 

 Id.
 

 at 326
 
 ,
 
 109 S.Ct. 2491
 
 . From its "cases concerning the extraterritorial effects of state economic regulation,"
 

 id.
 

 at 336
 
 ,
 
 109 S.Ct. 2491
 
 (citing
 
 Brown-Forman
 
 ,
 
 476 U.S. at 579, 581-83
 
 ,
 
 106 S.Ct. 2080
 
 ;
 
 Edgar
 
 ,
 
 457 U.S. at 642-43
 
 ,
 
 102 S.Ct. 2629
 
 ;
 
 Baldwin
 
 ,
 
 294 U.S. at 528
 
 ,
 
 55 S.Ct. 497
 
 ), the Supreme Court outlined the principle against extraterritoriality:
 

 1) A state statute may not regulate "commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."
 
 Id.
 
 at 336,
 
 109 S.Ct. 2491
 
 . Specifically, a state law may not have "the practical effect of establishing 'a scale of prices for use in other states.' "
 

 Id.
 

 (quoting
 
 Baldwin
 
 ,
 
 294 U.S. at 528
 
 ,
 
 55 S.Ct. 497
 
 ).
 

 2) "A statute that directly controls commerce occurring wholly outside the [legislating state's] boundaries ... is invalid regardless of whether the statute's extraterritorial reach was intended by the legislature."
 

 Id.
 

 The statute's "practical effect" is the focus of the inquiry.
 

 Id.
 

 3) In evaluating a statute's "practical effect," the Court considers "not only ... the consequences of the statute itself, but also ... how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if ... every[ ] State adopted similar legislation."
 
 Id.
 
 at 336,
 
 109 S.Ct. 2491
 
 . This is because "the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State."
 

 Id.
 

 at 336-37
 
 ,
 
 109 S.Ct. 2491
 
 .
 

 Applying these three directives, the Court invalidated the Connecticut law due to its "undeniable effect of controlling commercial activity occurring wholly outside the boundary of the State."
 

 Id.
 

 at 337
 
 ,
 
 109 S.Ct. 2491
 
 . The Court also emphasized that "the practical effect of this affirmation law, in conjunction with the many other beer-pricing and affirmation laws that have been or might be enacted throughout the country, is to create just the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude."
 

 Id.
 

 2.
 

 Maryland asserts that in
 
 Pharmaceutical Research & Manufacturers of America v. Walsh
 
 ,
 
 538 U.S. 644
 
 , 669,
 
 123 S.Ct. 1855
 
 ,
 
 155 L.Ed.2d 889
 
 (2003), the Supreme Court limited the principle against extraterritoriality in the dormant commerce clause context to price affirmation statutes. The Maine law at issue in
 
 Walsh
 
 established a program through which the state would "attempt to negotiate rebates with drug manufacturers to fund the reduced price for drugs offered to [program] participants."
 

 Id.
 

 at 649
 
 ,
 
 123 S.Ct. 1855
 
 . The petitioner challenged the law on the basis "that the rebate requirement constitutes impermissible extraterritorial regulation."
 

 Id.
 

 at 669
 
 ,
 
 123 S.Ct. 1855
 
 . The Supreme Court concluded that "[t]he rule that was applied in
 
 Baldwin
 
 and
 
 Healy
 
 " did not apply to the rebate program because "unlike price control or price affirmation statutes, '[the program] does not regulate the
 price of any out-of-state transaction, either by its express terms or by its inevitable effect.' "
 

 Id.
 

 (quoting
 
 Pharm. Research & Mfrs. of Am. v. Concannon
 
 ,
 
 249 F.3d 66
 
 , 81-82 (1st Cir. 2001) ).
 

 Maryland's reading of this language, while adopted by two of our sister circuits, is too narrow. The Supreme Court's statement does not suggest that "[t]he rule that was applied in
 
 Baldwin
 
 and
 
 Healy
 
 " applies
 
 exclusively
 
 to "price control or price affirmation statutes."
 
 See
 

 Walsh
 
 ,
 
 538 U.S. at 669
 
 ,
 
 123 S.Ct. 1855
 
 . Instead, the Court's statement emphasizes that the extraterritoriality principle is violated if the state law at issue "regulate[s] the price of any out-of-state transaction, either by its express terms or by its inevitable effect."
 

 Id.
 

 The Maine program challenged in
 
 Walsh
 
 directly affected only transactions in Maine and did not impact the prices drug manufacturers could charge elsewhere. Further, the Illinois statute at issue in
 
 Edgar
 
 , which permitted the Secretary of State to block the takeover of a target company with certain connections to Illinois, clearly was not a price control or price affirmation statute, but the Court nonetheless concluded that it ran afoul of the principle against extraterritoriality.
 
 See
 

 457 U.S. at 627, 641-42
 
 ,
 
 102 S.Ct. 2629
 
 ;
 
 see also
 

 Healy
 
 ,
 
 491 U.S. at
 
 333 n.9,
 
 109 S.Ct. 2491
 
 (stating that
 
 Edgar
 
 "significantly illuminates the contours of the constitutional prohibition on extraterritorial legislation"). We therefore reject Maryland's argument that
 
 Walsh
 
 limited the extraterritoriality principle only to price affirmation statutes.
 

 B.
 

 AAM's Challenge to the Act
 

 We now turn to the merits of AAM's dormant commerce clause challenge. AAM asserts that the Act directly regulates the prices charged for prescription drugs in out-of-state transactions, even though its provisions are triggered only when one of those drugs is available for sale in Maryland. Maryland acknowledges that the Act is intended to reach the manufacturers' conduct in the series of wholesale transactions that occur "upstream" from consumer retail sales but argues that these indirect effects do not violate the dormant commerce clause's prohibition on direct regulation.
 

 We agree with AAM that the district court erroneously upheld the Act under the dormant commerce clause. First, the Act is not triggered by any conduct that takes place within Maryland. Second, even if it were, the Act controls the prices of transactions that occur outside the state. Finally, the Act, if similarly enacted by other states, would impose a significant burden on interstate commerce involving prescription drugs. All of these factors combine to create a violation of the dormant commerce clause.
 

 1.
 

 The Act is Not Limited to Sales Wholly Within Maryland
 

 In reaching its conclusion, the district court emphasized that the Act's provisions "are triggered only when there is a drug ... made available for sale
 
 within
 
 the state." J.A. 486 (emphasis in original). The district court likened the Act to the Virginia statute at issue in
 
 Star Scientific
 
 , but this comparison is inapposite.
 
 See
 

 id.
 
 at 485-86. The Virginia statute at issue in
 
 Star Scientific
 
 did not apply to sales to distributors, retail chains, or consumers
 
 outside Virginia
 
 . Instead, it specifically required tobacco manufacturers selling cigarettes
 
 in Virginia
 
 to join a nationwide settlement agreement or place into escrow a fee of two cents per cigarette actually sold in the state.
 
 See
 

 Star Sci.
 
 ,
 
 278 F.3d at 346
 
 . The relevant conduct penalized by that statute was the sale of a cigarette
 
 in Virginia
 
 .
 

 In contrast, here, the Act's plain language allows Maryland to enforce the Act against parties to a transaction that did not result in a single pill being shipped to Maryland. Specifically, the Act prohibits "price gouging in the sale of an essential off-patent or generic drug."
 
 Md. Code Ann., Health-General § 2-802
 
 (a). "Essential off-patent or generic drug" is defined, in part, as a drug "[t]hat is made available for sale in [Maryland]."
 

 Id.
 

 § 2-801(b)(1)(iv). This "made available for sale" language does not limit the Act's application to sales that actually occur within Maryland, nor does it restrict the Act's operation to the context of a resale transaction with a Maryland consumer. Indeed, Maryland acknowledges that the Act is intended to reach sales upstream from consumer retail sales.
 
 See
 
 Oral Argument at 20:45-55,
 
 Ass'n for Accessible Meds. v. Frosh
 
 , No. 17-2166 (4th Cir. Jan. 24, 2018), http://www.ca4.uscourts.gov/oral-argument/listen-to-oral-arguments ("[T]he conduct that violates the statute could manifest itself in a wholesale transaction that occurs out-of-state.").
 
 [3]
 
 Such "upstream" sales would occur almost exclusively outside Maryland.
 

 Therefore, the Act targets conduct that occurs entirely outside Maryland's borders, a conclusion supported by the Act's prohibition of a manufacturer's use of the defense that it did not directly sell to a consumer in Maryland.
 
 See
 

 Md. Code Ann., Health-General § 2-803
 
 (g) ("[A] person who is alleged to have violated a requirement of this subtitle may not assert as a defense that the person did not deal directly with a consumer residing in [Maryland]."). The district court thus erred in relying on the Act's "made available for sale" language to uphold the Act.
 

 2.
 

 The Act Impacts Transactions that Occur Wholly Outside Maryland
 

 Even if the Act did require a nexus to an actual sale in Maryland, it is nonetheless invalid because it still controls the price of transactions that occur wholly outside the state.
 
 See
 

 Brown-Forman
 
 ,
 
 476 U.S. at 580
 
 ,
 
 106 S.Ct. 2080
 
 ("The mere fact that the effects of New York's ABC Law are triggered only by sales of liquor within the State of New York ... does not validate the law if it regulates the out-of-state transactions of distillers who sell in-state."). The Act, by its own terms, is not fixated on the price the Maryland consumer ultimately pays for the drug. Instead, the lawfulness of a price increase is measured according to the price the manufacturer or wholesaler charges
 
 in the initial sale of the drug
 
 . An "unconscionable" price increase is one that "[i]s excessive and not justified by the cost of producing the drug or the cost of appropriate expansion of access to the drug to promote public health."
 
 Md. Code Ann., Health-General § 2-801
 
 (f). Significantly, the retailers that sell the drug directly to the consumer cannot be held liable under the Act; only "[a] manufacturer or wholesale distributor" is prohibited from "engag[ing] in price gouging."
 

 Id.
 

 § 2-802(a) ;
 
 see
 
 id.
 

 § 2-803(g). This structure makes clear that the conduct the Act targets is the upstream pricing and sale of prescription drugs, and the parties agree that nearly all of these transactions occur outside Maryland.
 
 [4]
 

 Therefore, the Act effectively seeks to compel manufacturers and wholesalers to act in accordance with Maryland law outside of Maryland. This it cannot do.
 
 See
 

 Healy
 
 ,
 
 491 U.S. at 336
 
 ,
 
 109 S.Ct. 2491
 
 ("[T]he 'Commerce Clause ... precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State' ...." (quoting
 
 Edgar
 
 ,
 
 457 U.S. at 642-43
 
 ,
 
 102 S.Ct. 2629
 
 ));
 
 Rocky Mountain Farmers Union v. Corey
 
 ,
 
 730 F.3d 1070
 
 , 1103 (9th Cir. 2013) (explaining that "[s]tates may not mandate compliance with their preferred policies in wholly out-of-state transactions" (citing
 
 Walsh
 
 ,
 
 538 U.S. at 669
 
 ,
 
 123 S.Ct. 1855
 
 )).
 

 More importantly, the Act is effectively a price control statute that instructs manufacturers and wholesale distributors as to the prices they are permitted to charge in transactions that do not take place in Maryland. This is precisely the conduct "[t]he rule that was applied in
 
 Baldwin
 
 and
 
 Healy
 
 " aims to prevent.
 
 Walsh
 
 ,
 
 538 U.S. at 669
 
 ,
 
 123 S.Ct. 1855
 
 (concluding that the Maine law at issue was valid in part because "Maine does not insist that manufacturers sell their drugs to a wholesaler for a certain price"). We acknowledge that the Act does not establish a price schedule for prescription drugs, nor does it aim to tie the prices charged for prescription drugs in Maryland to the prices at which those drugs are sold in other states.
 
 See
 

 Healy
 
 ,
 
 491 U.S. at 338
 
 ,
 
 109 S.Ct. 2491
 
 ;
 
 Brown-Forman
 
 ,
 
 476 U.S. at 582
 
 ,
 
 106 S.Ct. 2080
 
 . But like the laws struck down in
 
 Healy
 
 and
 
 Brown-Forman
 
 , the Act attempts to dictate the price that may be charged elsewhere for a good. Any legitimate effects the Act may have in Maryland are insufficient to protect the law from invalidation.
 
 See
 

 Brown-Forman
 
 ,
 
 476 U.S. at 580
 
 ,
 
 106 S.Ct. 2080
 
 .
 

 3.
 

 The Act Implicates a Price Control as Opposed to an Upstream Pricing Impact
 

 Maryland attempts to justify the Act by arguing that its out-of-state pricing implications are merely "the upstream pricing impact of a state regulation."
 
 Freedom Holdings, Inc. v. Spitzer
 
 ,
 
 357 F.3d 205
 
 , 220 (2d Cir. 2004). But the Act is unlike the statute at issue in
 
 Freedom Holdings
 
 , which banned the importation of cigarettes manufactured by companies that did not comply with an escrow law similar to the one we upheld in
 
 Star Scientific
 
 .
 
 See
 

 id.
 

 at 211-14
 
 . The importers in
 
 Freedom Holdings
 
 argued that the New York law regulated out-of-state commerce by requiring manufacturers to sell cigarettes at a higher price "to purchasers in sales transactions that occur wholly outside [New York]."
 

 Id.
 

 at 220
 
 . The Second Circuit rejected the argument, holding that "[t]he extraterritorial effect described by [the importers] amounts to no more than the upstream pricing impact of a state regulation" and observing that "a similar pricing impact might result from any state regulation of a product."
 

 Id.
 

 The price change caused by the New York law at issue in
 
 Freedom Holdings
 
 -unlike that mandated by the Act here-was the result of natural market forces and was not artificially imposed by the laws of another state. By contrast, the Act aims to override prescription drug manufacturers' reaction to the market and to regulate the prices these manufacturers charge for their products. This is more than an "upstream pricing impact"-it is a price control.
 

 Therefore, the fundamental problem with the Act is that it "regulate[s] the price of [an] out-of-state transaction."
 
 Walsh
 
 ,
 
 538 U.S. at 669
 
 ,
 
 123 S.Ct. 1855
 
 . The Act instructs prescription drug manufacturers
 that they are prohibited from charging an "unconscionable" price in the initial sale of a drug, which occurs outside Maryland's borders. Maryland cannot, even in an effort to protect its consumers from skyrocketing prescription drug costs, impose its preferences in this manner. The "practical effect" of the Act, much like the effect of the statutes struck down in
 
 Brown-Forman
 
 and
 
 Healy
 
 , is to specify the price at which goods may be sold beyond Maryland's borders.
 
 See
 

 Healy
 
 ,
 
 491 U.S. at 336
 
 ,
 
 109 S.Ct. 2491
 
 ("The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State." (citing
 
 Brown-Forman
 
 ,
 
 476 U.S. at 579
 
 ,
 
 106 S.Ct. 2080
 
 )). The district court erred by failing to account for this impact.
 

 4.
 

 The Act Burdens Interstate Commerce in Prescription Drugs
 

 The Act's significant scope is further illuminated by the burden similar legislation would place on interstate commerce.
 
 See
 

 Healy
 
 ,
 
 491 U.S. at 336
 
 ,
 
 109 S.Ct. 2491
 
 ("[T]he practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation."). Because the Act targets wholesale rather than retail pricing, an analogous restriction imposed by a state other than Maryland has the potential to subject prescription drug manufacturers to conflicting state requirements.
 
 See
 

 id.
 

 at 336-37
 
 ,
 
 109 S.Ct. 2491
 
 ("Generally speaking, the Commerce Clause protects against inconsistent legislation arising from the projection of one state regulatory regime into the jurisdiction of another State.");
 
 Brown-Forman
 
 ,
 
 476 U.S. at 583-84
 
 ,
 
 106 S.Ct. 2080
 
 . And the Act's relatively subjective definition of what constitutes an unlawful price increase only exacerbates the problem. If multiple states enacted this type of legislation, then a manufacturer may consummate a transaction in a state where the transaction is fully permissible, yet still be subject to an enforcement action in another state (such as Maryland) wholly unrelated to the transaction.
 

 In upholding the Act, the district court referred to this conundrum as a "practical problem" and suggested that prescription drug manufacturers could simply modify their distribution systems to track the shipments of drugs bound for Maryland and isolate those drugs in order to comply with the Act. J.A. 489-90. It is indeed true that the dormant commerce clause does not "protect[ ] the particular structure or methods of operation in a retail market."
 
 Exxon Corp. v. Governor of Md.
 
 ,
 
 437 U.S. 117
 
 , 127,
 
 98 S.Ct. 2207
 
 ,
 
 57 L.Ed.2d 91
 
 (1978). But the Act requires manufacturers and wholesale distributors to do more than alter their distribution channels. It sets prescription drug prices in a way that "interfere[s] with the natural function of the interstate market" by superseding market forces that dictate the price of a good.
 
 McBurney v. Young
 
 ,
 
 569 U.S. 221
 
 , 235,
 
 133 S.Ct. 1709
 
 ,
 
 185 L.Ed.2d 758
 
 (2013) (quoting
 
 Hughes v. Alexandria Scrap Corp.
 
 ,
 
 426 U.S. 794
 
 , 806,
 
 96 S.Ct. 2488
 
 ,
 
 49 L.Ed.2d 220
 
 (1976) ). If Maryland compels manufacturers to sell prescription drugs in the initial transaction at a particular price, but another state imposes a different price, then manufacturers could not comply with both laws in a single transaction. The manufacturers' compliance would require more than modification of their distribution systems; it would force them to enter into a separate transaction for each state in order to tailor their conduct so as not to
 violate any state's price restrictions. Even then, if a drug from a transaction addressed to another state were later made available for sale in Maryland, the Act would permit Maryland to penalize the manufacturer. The potential for "the kind of competing and interlocking local economic regulation that the Commerce Clause was meant to preclude" is therefore both real and significant.
 
 Healy
 
 ,
 
 491 U.S. at 337
 
 ,
 
 109 S.Ct. 2491
 
 . We are thus pressed to invalidate the Act.
 

 5.
 

 In sum, we hold that the Act is unconstitutional under the dormant commerce clause because it directly regulates transactions that take place
 
 outside Maryland
 
 . We therefore reverse the district court's dismissal of this claim and remand this matter to the district court with instructions to enter judgment in favor of AAM.
 

 To be clear, we in no way mean to suggest that Maryland and other states cannot enact legislation meant to secure lower prescription drug prices for their citizens. Indeed, the Supreme Court upheld a Maine law with that very aim in
 
 Walsh
 
 .
 
 See
 

 538 U.S. at 653-54, 669-70
 
 ,
 
 123 S.Ct. 1855
 
 .
 

 Although we sympathize with the consumers affected by the prescription drug manufacturers' conduct and with Maryland's efforts to curtail prescription drug price gouging, we are constrained to apply the dormant commerce clause to the Act. Our dissenting colleague suggests that by doing so, we imply that prescription drug manufacturers have a constitutional right to engage in price gouging.
 
 See post
 
 at 692-93. This is a sweeping and incorrect conclusion to draw from our holding that Maryland is prohibited from combating prescription drug price gouging
 
 in the manner utilized by the Act
 
 . Prescription drug manufacturers are by no means "constitutionally entitled,"
 
 id.
 
 at 57, to engage in abusive prescription drug pricing practices. But Maryland must address this concern via a statute that complies with the dormant commerce clause of the U.S. Constitution.
 

 III.
 

 Conclusion
 

 For the foregoing reasons, we reverse the district court's dismissal of AAM's dormant commerce clause challenge and remand with instructions to enter judgment in favor of AAM. AAM's request for an injunction pending this appeal is denied as moot.
 

 REVERSED AND REMANDED WITH INSTRUCTIONS
 

 Because we hold that the statute is unconstitutional pursuant to the dormant commerce clause, we need not address whether it is also void for vagueness.
 

 Citations to the "J.A." refer to the Joint Appendix filed by the parties in this appeal.
 

 Thus, even if we applied a limiting construction to require a consumer sale in Maryland prior to enforcement of the Act, Maryland's own interpretation of the Act clarifies that it targets not a consumer retail sale but the manufacturer's initial sale of the drug.
 

 AAM challenges the Act only as it applies to these out-of-state sales.